NANCY SWEENEY
CLERK DISTRICT COURT

2016 NOV 16 AM 9: 57

FILED

BY _____
DEPUTY

Ryan R. Shaffer
MEYER, SHAFFER & STEPANS, PLLP
305 S. Fourth St. East, Suite 101
Missoula, MT 59801
Tel: (406) 543-6929
Fax: (406) 721-1799
ryan@mss-lawfirm.com

INDEXED

*Attorneys for Plaintiff*

## MONTANA FIRST JUDICIAL DISTRICT COURT
## LEWIS AND CLARK COUNTY

DEEANN COONEY
PRESIDING JUDGE

| | |
|---|---|
| PACIFIC NORTHWEST SOLAR, LLC<br><br>Plaintiff,<br><br>vs.<br><br>NORTH WESTERN CORPORATION, A DELAWARE CORPORATION DBA NORTHWESTERN ENERGY,<br><br>Defendant. | Cause No.: BDV 2016-929<br><br>PACIFIC NORTHWEST SOLAR, LLC'S COMPLAINT AGAINST NORTHWESTERN ENERGY FOR:<br><br>I. Breach of Contract<br>II. Breach of Covenant of Good Faith and Fair Dealing<br>III. Negligent Misrepresentation<br>IV. Constructive Fraud<br>V. Actual Fraud<br>VI. Declaratory Relief |

COMES NOW Plaintiff, Pacific Northwest Solar, LLC ("PNW") and alleges as follows against North Western Corporation, a Delaware corporation, doing business as NorthWestern Energy ("NWE").

### GENERAL ALLEGATIONS

1. PNW is, and all relevant times indicated herein was, an Oregon limited liability company duly organized and existing under the laws of the State of Oregon, and authorized to conduct business in the State of Montana.

///

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy     1

Exhibit B

2. North Western Corporation is, and at all relevant times indicated herein was, a Delaware corporation doing business as NorthWestern Energy, and authorized to conduct business in the State of Montana.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this civil matter pursuant to MCA 3-5-302.

4. Venue is proper in this District Court because NWE resides this judicial district, and no other district is more properly suited pursuant to either MCA 25-2-118 or 25-2-121.

## FACTUAL ALLEGATIONS

5. PNW is a distributive and utility-scale solar energy developer headquartered in Oregon. PNW develops projects throughout the United States, including in Montana.

6. Pursuant to the Public Utility Regulatory Policies Act ("PURPA") and its progeny, an investor owned utility like NWE must provide qualifying facilities (as defined by federal law) with power purchase agreements ("PPAs") whereby the utility purchases all of the power generated from a given project at the utility's avoided cost rate determined at the time of contracting (upon election by the qualifying facility).

7. In Montana, and under the auspices of shared jurisdiction with the Federal Energy Regulatory Commission, NWE has to have its avoided cost rate schedule approved by the Montana Public Service Commission (the "Commission"). In 2015, the Commission approved the avoided cost rate schedule available to developers of

Exhibit B

qualifying facilities up to three (3) megawatts in size. The PPA information and avoided cost rate schedule are contained within Schedule QF-1. A true and correct copy of the relevant Schedule QF-1 is attached hereto as Exhibit A.

8. Developers with projects that meet the requirements of Schedule QF-1 are entitled to receive a PPA – it is not discretionary on the part of NWE.

9. In late December 2015 to early January 2016, consultants working for PNW sought to identify the process to be used in order to obtain PPAs for projects under development in NWE's service territory in Montana. Those consultants reached Frank Bennett, an employee of NWE, who supplied what was termed a "standard contract" that should be filled in with project-specific information, but noting that any material changes to the document would be unwelcomed and rejected. It was relayed that once the information was confirmed, the PPA would be issued for signature.

10. In reliance on the representations made by Mr. Bennett concerning the PPA, On January 8, 2016, PNW emailed Mr. Bennett, an employee of NWE, with a signature-ready proposed PPA (the same form as provided by Mr. Bennett earlier, with the project-specific information filled in) for a single project (the Cottonwood project). PNW was ready, willing and able to enter into that agreement as of that date. The intent was to agree on a standard form and apply that to the other projects that PNW was ready to commit to.

11. On February 11, 2016, having heard nothing from Mr. Bennett as to the earlier correspondence, PNW again emailed Mr. Bennett, this time providing a standard form agreement as to an additional three (3) projects (the Bootlegger, Manta, and Benton

**Exhibit B**

projects). Again, each agreement was signature-ready and PNW was ready, willing and able to enter into those agreements as of that date.

12. On February 17, 2016, PNW staff exchanged several emails with Mr. Bennett as to one (1) of PNW's projects (the Cottonwood project) where Mr. Bennett requested information to support the PPA request – PNW provided the requested information within minutes of the request. PNW then asked if there was anything else that might be needed by NWE, and was not given a response.

13. On February 23, 2016, PNW exchanged several emails with Mr. Bennett concerning the project size of its QF projects submitted for PPAs. Mr. Bennett indicated that the projects exceeded the threshold size for PPAs available under the Schedule QF-1 Tariff. PNW responded within minutes to the erroneous argument of the project size, confirming the projects would not exceed three (3) megawatts and thus qualified under the Tariff. PNW asked that NWE confirm the same.

14. On February 25, 2016, PNW emailed Mr. Bennett to follow up and ask if the explanation provided by PNW earlier (regarding qualification under the QF-1 Tariff) resolved the concerns of NWE in issuing the PPAs requested. PNW was told that the explanation provided was okay, but that NWE was waiting on its own legal counsel to approve.

15. On March 1, 2016, PNW emailed Mr. Bennett to inquire as to the status of the submitted PPAs and any legal review by NWE's counsel, but PNW received no response.

///

**Exhibit B**

16. On March 4, 2016, PNW emailed Mr. Bennett to inquire as to the status of the submitted PPAs and any legal review by NWE's counsel, but received no immediate response.

17. On March 7, 2016, PNW received an email from Mr. Bennett that he had not yet received direction from NWE's legal counsel regarding the suitability of PNW's projects for the QF-1 Tariff. PNW advised Mr. Bennett of its concerns, indicating that "We submitted our requests back in January and it's now mid-march and we're not yet off the ground (when it was my expectation to have signed PPAs at this point)." PNW asked if there was anything that PNW could do to streamline the process to obtain executed PPAs.

18. On March 9, 2016, PNW emailed Mr. Bennett to inquire as to the status of NWE's legal counsel's review of the PPA qualification under QF-1. PNW did not receive an immediate response.

19. On March 11, 2016, Mr. Bennett emailed PNW advising that NWE did not believe PNW's three (3) megawatt projects were qualified for PPAs under QF-1. Within hours, PNW responded to Mr. Bennett to confirm that PNW's projects qualified under QF-1. PNW likewise called Al Brogan, counsel for NWE, to discuss the issue.

20. On March 15, 2016, PNW had extensive email exchanges with Mr. Brogan on the issue of PPA qualification for PNW's three (3) megawatt projects. PNW provided responses within minutes of Mr. Brogan's emails.

21. On March 17, 2016, PNW had an email exchange and a phone conversation with Mr. Brogan regarding the fact that PNW's three (3) megawatt projects qualified

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy　　　　　5

**Exhibit B**

under QF-1. PNW specifically referenced the fact that NWE had executed at least one (if not more) of the "standard contract" provided to PNW earlier and upon which there was now disagreement. PNW indicated that it would be fair to use the same form of "standard contract" as previously used by NWE with other developers.

22. On March 30, 2016, PNW submitted PPA requests to Mr. Bennett for an additional eight (8) projects (Ulm, Choteau, Boulder, Stuckey, Stanford, Geraldine, Gage, and Dry Creek). PNW submitted the same standard form previously used (and sent to PNW by NWE). The agreements were signature-ready and PNW was ready, willing and able to enter into those agreements on that date.

23. On April 11, 2016, PNW provided Jon Oostra, contract counsel for NWE, the same "standard contract" originally provided to PNW by Mr. Bennett. PNW asked that any changes be sent back quickly to facilitate a prompt completion of the PPA process.

24. On April 12, 2016, PNW had several email exchanges with Mr. Bennett concerning the status of the PPA processing for PNW's projects. At that time, Mr. Bennett told me that "I am hoping to forward all of your solar contracts to management today."

25. On April 15, 2016, PNW emailed Mr. Bennett to inquire as to the status of the PPA changes to be made by NWE (not PNW). PNW also contacted Mr. Brogan and Mr. Oostra regarding the same issue.

26. On April 20, 2016, PNW confirmed with Montana PSC Staff that Mr. Brogan had been advised that the PNW project size qualified under QF-1. PNW

attempted to reach Mr. Brogan and Mr. Oostra regarding the same in order to get the final PPAs executed.

27.     On April 26, 2016, PNW received revisions to the "standard contract" from Mr. Oostra. PNW responded substantively within hours to Mr. Oostra.

28.     On April 27, 2016, PNW had a phone conversation with Mr. Oostra regarding the changes to the "standard contract." Mr. Oostra sent PNW a copy of the new draft version to review. PNW emailed Mr. Oostra that PNW approved of the draft and that PNW was ready (still) to move forward with execution of all PPAs submitted to date. Mr. Oostra indicated he had to resolve two issues on NWE's end.

29.     On April 28, 2016, Mr. Oostra emailed PNW with a further revised version of "standard contract" confirming the two prior issues to be resolved. That same day, PNW emailed Mr. Oostra that PNW confirmed this yet new draft version of the "standard contract" PPA, stating specifically "We approve of this form." PNW advised Mr. Oostra that PNW would use that approved form for each of PNW's projects and send for execution.

30.     On April 29, 2016, PNW emailed Mr. Bennett and Mr. Oostra with an executed PPA using the form provided by NWE on all previously submitted projects. Again, PNW was ready, willing and able to be bound by the terms of the PPAs.

31.     On May 4, 2016, PNW exchanged emails with Mr. Bennett regarding a typographic error in two of the project PPAs. PNW also provided updated FERC Form 556s as to several projects at the request of NWE (although not required by the QF-1 Tariff nor the PPA, but provided as a courtesy).

32. On May 6, 2016, PNW emailed Mr. Bennett, providing proposed PPAs for an additional six (6) projects (Railroad, Absarokee, Curry, Goosebill, Lavina, and Mills), using the same approved form received from NWE.

33. On May 6, 2016, PNW received an email from Mr. Oostra with a further revised "standard contract" now termed "draft final." Within 45 minutes, PNW responded to confirm all questions posed by Mr. Oostra and further stating that PNW believed all necessary information to have been provided to date.

34. On May 9, 2016, PNW emailed Mr. Oostra regarding final execution of the PPAs. PNW thereafter had a phone conversation with Mr. Oostra, where it was discussed that the "Effective Date" to be used for the PPAs would be the date the last party executed the same. PNW then offered to again send individual PPAs for each project signed by PNW so that they simply need to be counter-signed by NWE. PNW was asked by NWE to send only the unsigned word versions, and PNW did so within hours. Concurrently with that conversation, PNW emailed to Mr. Bennett: "I believe we are all set on information needed for these and I think we've addressed all pending questions of yours. Please let me know if there are any other questions you have (note that we updated the coordinates to match the 556s on Dry Creek in addition to those noted before and have filed all FERC amendments where necessary). From our perspective these are complete and final - please let me know if you need anything else from me."

35. On May 10, 2016, PNW emailed Mr. Bennett concerning review of the PPAs for signature by NWE. Mr. Bennett advised via responsive email that: "I will

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy      8

verify incoming email between when I last worked on your project and the last update you sent and I will review them one at a time. If I find anything out of order I will let you know. If they are ok from our review I will send an email to management to sign the PPA's. **As for timing, I would anticipate later today or tomorrow.**" (emphasis added).

36. On May 11, 2016, PNW emailed Mr. Bennett to ask as to the status of the PPAs, but PNW did not receive a response.

37. On May 13, 2016, PNW emailed Mr. Bennett to ask as to the status of the PPAs. Mr. Bennett responded via email that: "I am working through my backlog of emails. I hope to be caught up soon." PNW also emailed Mr. Oostra regarding status and asked for confirmation of timing of executed PPAs, but no response was received.

38. On May 17, 2016, PNW emailed Mr. Bennett to again ask as to status of the PPAs. PNW was told that progress was being made. PNW offered to supply any information or effort that may be needed to get the PPAs executed. PNW also emailed Mr. Oostra regarding the same issue but received no response.

39. On May 18, 2016, PNW emailed Mr. Oostra to inquire as to the status of the PPA execution. PNW was given a secondary contact regarding this issue - Bleau LaFave. PNW confirmed again that PNW was ready, willing and able to move forward with the PPAs as submitted (and that the only reason we had yet to provide signatures to the "draft final" version was because of NWE's express and direct request that PNW not do so). PNW attempted to contact Mr. LaFave but did not reach him that day.

///

///

40. On May 18, 2016, NWE filed an Emergency Motion seeking to stay its obligations under Schedule QF-1 until the Commission ruled upon the underlying request by NWE to alter the avoided cost schedule available therein for new projects.

41. On May 19, 2016, PNW emailed Mr. Bennett to confirm status of PPAs and processing, indicating that PNW was still ready to provide any information needed to have NWE execute the PPAs. PNW exchanged voicemails with Mr. LaFave.

42. On May 23, 2016, PNW emailed Mr. Bennett to confirm status of the PPAs and was advised by Mr. Bennett that several had been approved for signature. PNW asked which projects had been approved, but received no response.

43. On May 24, 2016, PNW had a phone conversation with Mr. LaFave concerning the timing for execution of all 21 PPAs that PNW had submitted to date. Mr. LaFave indicated that there was a new internal process being employed for PPAs that did not previously exist within NWE. PNW indicated that PNW would fly to NWE's Montana offices to execute the PPAs on June 2, 2016 to expedite the process (again demonstrating the commitment of PNW to be bound by the terms and conditions of the PPAs).

44. On May 26, 2016, PNW had a phone conversation with Mr. LaFave to change the date of its visit to NWE's Montana offices to June 8, 2016 to allow NWE to get all of the PPAs executed prior to that time via its new process for handling PPAs (established only after it filed its Emergency Motion).

///

///

45. On May 27, 2016, PNW emailed Mr. Bennett concerning the status of the PPAs. PNW also exchanged emails with Mr. Bennett to correct/supply information requested by NWE on a project-specific basis.

46. On May 31, 2016, PNW emailed Mr. Bennett to confirm project information requested by NWE. PNW asked for confirmation of receipt of said information, but did not receive a response.

47. On June 2, 2016, PNW emailed Mr. Bennett confirming the revised date for its visit to NWE's Montana offices to execute all 21 PPAs for PNW's projects. After PNW asked if there was anything else needed from PNW, Mr. Bennett responded via email that: "The final group will be those that I have not reviewed yet. . . I will let you know if I am missing anything further." Given discussions to date with NWE staff, PNW was led to believe that all 21 PPAs would therefore be ready for signature upon its visit on June 8, 2016.

48. On June 7, 2016, PNW emailed Mr. Bennett to confirm its plan to travel the following day to NWE's Montana offices to counter-execute all 21 PPAs. At that point PNW was told that four (4) PPAs had already been signed by NWE.

49. On June 8, 2016, PNW traveled to NWE's Montana offices with the intent of executing the 21 PPAs. PNW attempted to reach Mr. Bennett several times throughout the day to arrange for the signing of PPAs, but was unable to reach him. PNW later learned that Mr. Bennett had left the offices earlier in the day.

50. On June 9, 2016, PNW met with Mr. Bennett and Mr. LaFave prior to the Commission's hearing on NWE's Emergency Motion in NWE's offices. PNW was told

that the PPAs would be processed, and that PNW did not have to travel to Montana, that instead PNW simply could have emailed signatures to the PPAs. Although NWE was well aware of PNW traveling to Montana for the sole purpose of executing the PPAs, this was the first time NWE confirmed digital signatures were acceptable. On this same day, PNW submitted signatures for all 21 PPAs to Mr. Bennett and Mr. Oostra, again confirming PNW's firm and unconditional commitment to provide energy pursuant to those agreements.

51.     On June 9, 2016, NWE's legal counsel (Jon Alke) conceded to the Commission that NWE was obligated to provide PNW with the 21 PPAs already requested, implicitly agreeing that a legally enforceable obligation had already been established as to those PPAs.

52.     On June 16, 2016, Mr. Bennett emailed PNW that: **"I have NWE signature pages that I want to insert along with yours into our Execution Copy of PPAs**. I have 4 this am and hope to have an additional 8 by this afternoon. The remainder should follow relatively soon." (Emphasis added). Hence, at this point no fewer than 4 PPAs and possibly north of 12 PPAs were fully executed and effective prior to the Commission's Order.

53.     On June 29, 2016, despite weeks of requests for the fully executed PPAs, Mr. Alke emailed PNW to say that none of the PPAs were executed because the "Effective Date" had not been filled in by NWE. PNW countered the need for such a date to make the agreements binding, and reiterated NWE's earlier admission that the effective date is simply the last date the last part executed the agreement (which was only

known by NWE since PNW had already signed all agreements). PNW has yet to receive a single fully executed PPA from NWE, despite the admission that such fully executed PPAs exist.

54. Upon receipt of the 21 PPAs submitted to NWE (and to which PNW has a legally enforceable obligation), PNW will be obligated to put up nearly $1 million in security pursuant to the terms of the PPAs (as the PPAs create an absolute, unconditional commitment to deliver energy, capacity, or energy and capacity). PNW is ready, willing and able to make that commitment and would have done so in a timely manner upon receipt of the executed PPAs (which govern the timing for the same).

55. PNW has also undertaken development operations and achieved the necessary clearances to move forward on virtually all of its projects submitted for a PPA.

56. PNW made a firm and unconditional commitment to provide energy pursuant to the QF-1 PPAs submitted to NWE starting in January 2016 and remains committed to the same even now.

## FIRST COUNT

## ANTICIPATORY BREACH OF CONTRACT

57. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

58. PNW and NWE fully executed no fewer than four (4) written contracts (the PPAs) and possibly more than 12 written contracts on or before June 16, 2016 as confirmed by the admissions of NWE in correspondence to PNW of that date. Once the PPAs were executed by both parties, they were then binding and in full force and effect.

59. PNW has fully performed all of the covenants and conditions of the PPAs, or was excused or prevented from performing the same as a result of NWE's breach(es) of the same.

60. PNW alleges that NWE has anticipatorily breached the contracts by, amongst other things, failing to abide by the terms and conditions therein, by stating that no such contracts exist, and by refusing to honor the purchase obligation contained therein for power to be generated from the projects to which they are tied.

61. As a proximate and direct result of NWE's breaches, and each of them, PNW has been damaged in an amount to be proven at trial.

## SECOND COUNT

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

62. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

63. PNW and NWE fully executed no fewer than four (4) written contracts (the PPAs) and possibly north of 12 written contracts on or before June 16, 2016 as confirmed by the admissions of NWE in correspondence to PNW of that date. Once the PPAs were executed by both parties, they were then binding and in full force and effect.

64. PNW has fully performed all of the covenants and conditions of the PPAs, or was excused or prevented from performing the same as a result of NWE's breach(es) of the same.

65. NWE has breached the covenant of good faith and fair dealing by, amongst other things, failing to honor already-executed agreements, asserting that already-

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy          14

**Exhibit B**

executed agreements are invalid or unenforceable, and by refusing to provide such already-executed agreements to PNW.

66. As a proximate and direct result of NWE's breaches of the covenant of good faith and fair dealing, and each of them, PNW has been damaged in an amount to be proven at trial.

## THIRD COUNT

## NEGLIGENT MISREPRESENTATION

67. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

68. NWE, through its agents Frank Bennett, Al Brogan, Bleau LaFave, and John Alke represented to PNW and to the Commission that PNW would be provided with its 21 requested PPAs in accordance with Schedule QF-1.

69. Such representation was false and material inasmuch as no PPAs have been provided to PNW and it appears no PPAs as submitted to NWE will be provided in light of Commission Order No. 7500.

70. At the time of the false representations, NWE's agents, regardless of their actual belief, made the representations without any reasonable ground for believing them to be true or knew of the falsity or were ignorant to the truth of their statements and actions, though PNW was then ignorant of the falsity of the representations.

71. At the time of the false representations, NWE's agents intended that their representations should be acted upon by PNW and in the manner reasonably contemplated thereby.

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy                 15

Exhibit B

72. PNW reasonably and justifiably relied upon the truth of the false representations by NWE's agents.

73. PNW had a right to rely upon the representations made by NWE's agents relative to the PPAs.

74. PNW is currently unable to solicit new PPAs from NWE for its projects in Montana as a result of Commission Order 7500 which precludes NWE from executing new PPAs. Any new PPAs to be secured will be at the new avoided cost schedule.

75. As a consequent and proximate cause of NWE's misrepresentations, upon which PNW reasonably and justifiably relied, PNW has been damaged in an amount to be proven at trial.

## FOURTH COUNT
## CONSTRUCTIVE FRAUD

76. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

77. NWE had a duty to PNW to provide true, accurate and reliable information concerning the PPAs sought by PNW.

78. NWE, through its agents Frank Bennett, Al Brogan, Bleau LaFave, and John Alke represented to PNW and to the Commission that PNW would be provided with its 21 requested PPAs in accordance with Schedule QF-1.

79. Such representation was false and material inasmuch as no PPAs have been provided to PNW and it appears no PPAs as submitted to NWE will be provided in light of Commission Order No. 7500.

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy                16

**Exhibit B**

80. At the time of the false representations, NWE's agents, regardless of their actual belief, made the representations without any reasonable ground for believing them to be true or knew of the falsity or were ignorant to the truth of their statements and actions, though PNW was then ignorant of the falsity of the representations.

81. At the time of the false representations, NWE's agents intended that their representations should be acted upon by PNW and in the manner reasonably contemplated thereby so that NWE could gain an advantage over PNW.

82. PNW reasonably and justifiably relied upon the truth of the false representations by NWE's agents.

83. PNW had a right to rely upon the representations made by NWE's agents relative to the PPAs.

84. PNW is currently unable to solicit new PPAs from NWE for its projects in Montana as a result of Commission Order 7500 which precludes NWE from executing new PPAs. Any new PPAs to be secured will be at the new avoided cost schedule.

85. As a consequent and proximate cause of NWE's misrepresentations, upon which PNW reasonably and justifiably relied, PNW has been damaged in an amount to be proven at trial.

### FIFTH COUNT
### ACTUAL FRAUD

86. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

///

87. NWE, through its agents Frank Bennett, Al Brogan, Bleau LaFave, and John Alke represented to PNW and to the Commission that PNW would be provided with its 21 requested PPAs in accordance with Schedule QF-1.

88. Such representation was false and material inasmuch as no PPAs have been provided to PNW and it appears no PPAs as submitted to NWE will be provided in light of Commission Order No. 7500.

89. At the time of the false representations, NWE's agents knew of the falsity or were ignorance to the truth of their statements and actions, though PNW was then ignorant of the falsity of the representations.

90. At the time of the false representations, NWE's agents intended that their representations should be acted upon by PNW and in the manner reasonably contemplated thereby.

91. PNW reasonably and justifiably relied upon the truth of the false representations by NWE's agents.

92. PNW had a right to rely upon the representations made by NWE's agents relative to the PPAs.

93. PNW is currently unable to solicit new PPAs from NWE for its projects in Montana as a result of Commission Order 7500 which precludes NWE from executing new PPAs. Any new PPAs to be secured will be at the new avoided cost schedule.

94. As a consequent and proximate cause of NWE's misrepresentations, upon which PNW reasonably and justifiably relied, PNW has been damaged in an amount to be proven at trial.

Exhibit B

## FIFTH COUNT

## DECLARATORY RELIEF

95. PNW re-alleges and incorporates by reference each and every allegation set forth above, inclusive, as though fully set forth herein.

96. A dispute has arisen and an actual controversy exists as between PNW and NWE in relation to the following:

    a. Whether the PPAs executed by both parties on or before June 16, 2016 (prior to the Commission's issuance of Order No. 7500) are valid, binding and enforceable.

97. A declaration of the respective liability and rights of the parties is necessary as PNW has no other adequate remedy at law, and such declaration will avoid a multiplicity of actions that will otherwise be required. Moreover, PNW is unable to move forward with expended additional resources on development of the subject projects without clarity on this issue as the PPAs are the financial underpinning of the projects.

98. A judicial determination is necessary and appropriate at this time in order that PNW and NWE can resolve a dispute concerning the PPAs.

**WHEREFORE**, Plaintiff PNW prays for judgment against Defendant NWE as follows:

### On Counts One and Two

1. For compensatory damages according to proof;
2. For pre-judgment interest at the maximum legal rate;
3. For such other and further relief as this Court deems just and proper.

Pacific Northwest Solar, LLC's Complaint Against NorthWestern Energy     19

### On Counts Three, Four and Five

1. For compensatory damages according to proof;

2. For pre-judgment interest at the maximum legal rate;

3. For such other and further relief as this Court deems just and proper.

### On Count Six

1. A judicial declaration that those PPAs already executed on or before the Commission's issuance of Order No. 7500 are valid, binding and enforceable;

2. For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUMBITTED this _10_, day of November, 2016

Ryan Shaffer
**Meyer, Shaffer & Stepans, PLLP**
305 S. Fourth St. E., Ste. 101
Missoula, MT 59801
Tel.: (406) 543-6929
Fax: (406) 721-1799
ryan@mss-lawfirm.com
Attorneys for Plaintiff