# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# HELENA DIVISION

PACIFIC NORTHWEST SOLAR, LLC,

        Plaintiff,

vs.

NORTHWESTERN CORPORATION, A DELAWARE CORPORATION DBA NORTHWESTERN ENERGY,

        Defendant.

No. CV-16-114-H-SEH

ORDER

FILED
AUG 2 1 2018
Clerk, U.S. District Court
District Of Montana
Helena

Pending before the Court is Defendant Northwestern Corporation's D/B/A Northwestern Energy's Motion for Partial Summary Judgment by Reason of Impossibility of Performance.[1] A hearing on the motion was held on August 6, 2018.[2] For reasons stated below, the motion is denied.

## Background

Pacific Northwest Solar, LLC ("PNW") is a developer of solar energy and a qualified facility ("QF") developing solar projects within Montana and around the

---

[1] Doc. 60.

[2] Doc. 97.

United States.³ Northwestern Corporation ("NWE") is a public utility providing energy to Montanans.⁴ The case arises from a contract dispute over the negotiation and performance of power purchase agreements ("PPAs") for four solar projects ("Four Projects") executed by PNW and NWE.

The Federal Power Act ("FPA")⁵ provides "any person who owns or operates facilities used to transmit or sell electric energy in interstate commerce at wholesale is subject to the jurisdiction and regulator power of the [Federal Energy Regulatory Commission ("FERC")]."⁶ That act was amended by the Public Utility Regulation Policies Act ("PURPA") in 1978 "to encourage the development of cogeneration and small power production facilities, and thus to reduce American dependence on fossil fuels by promoting increased energy efficiency."⁷ "[T]he states play the primary role in calculating avoided costs and in overseeing the contractual relationship between QFs and utilities . . . ."⁸ In Montana, the state's

---

³ *See* Docs. 75 at 2; 35 at 2.

⁴ *See* Doc. 75 at 2.

⁵ *See* 16 U.S.C. §§ 791-823d (2018).

⁶ *Indep. Energy Producers Ass'n v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 850 (9th Cir. 1994) (citing 16 U.S.C. § 824(a) & (e)).

⁷ *Id.*

⁸ *Id.* at 856.

regulatory body is the Montana Public Service Commission ("PSC"), which has the "full power of supervision, regulation, and control" of public utilities.[9]

PURPA's framework recognizes that QFs require some guarantee that they will reclaim investments in their facilities:

> [L]ike utilities, QFs need sufficient certainty with regard to the opportunity to recover and earn a reasonable return on their investments in electric generating facilities. To provide for such security, FERC requires that QFs have the option of selling their energy and capacity to public utilities pursuant to long-term contracts at rates based on estimates of a public utility's avoided cost over the term of the contract."[10]

PURPA also requires the public utility to purchase all of the power generated from a QF at the utility's avoided cost rate set at the time of contracting as a means for providing a market for a QF's energy.[11]

The PSC must approve a public utility's avoided cost rate.[12] "Avoided costs [are] the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying

---

[9] MONT. CODE ANN. § 69-3-102 (2017).

[10] Doc. 75-10 at 30 (citation omitted) (citing Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,224 (February 25, 1980).

[11] *See* 16 U.S.C. § 824a-3(b).

[12] *See* MONT. CODE ANN. § 69-3-603 (2017).

facilities, such utility would generate itself or purchase from another source."[13] Such standard rates, "[i]n the case of purchases, are based on avoided costs to the utility, are computed annually by the utility . . . are reviewed by the [PSC], and are applicable to all contracts with qualifying facilities which do not choose to negotiate a different rate."[14] "In January 2016, the PSC established the Schedule QF-1 as the standard non-negotiated tariff rates for [QFs] in Montana.[15]

In January and February 2016, PNW submitted to NWE proposed PPAs for the Four Projects at issue in this case.[16] NWE's system for development of a QF requires two separate steps: (1) execution of a PPA; and (2) interconnection to the transmission system.[17] In this case, the parties did not negotiate rates for the Four Projects.[18] "[I]nstead, the PPAs incorporated the standard tariff rates then in effect in Schedule QF-1."[19]

---

[13] 18 C.F.R. § 292.101(6) (2018).

[14] MONT. ADMIN. R. 38.5.1901(2)(k)(i)(2018).

[15] *See* Doc. 75 at 2.

[16] *See* Doc. 75 at 2.

[17] *See* Docs. 75 at 2; 75-7 at 4.

[18] Doc. 75 at 2.

[19] Doc. 75 at 2.

"In March 2016, NWE received multiple applications requesting PPAs using the standard rate tariff in Schedule QF-1."[20] In response, "NWE filed a Motion for Emergency Suspension of the QF-1 Tariff for New Solar Qualifying Facilities with Nameplate Capacities Greater than 100 kW" ("Motion for Emergency Suspension") with the PSC on May 17, 2016.[21] It cited concern about potential harm to NWE's customers resulting from continued use of the QF-1 standard rates as the basis for the emergency motion[22] and sought temporary suspension of the standard rates in "the Schedule QF-1 tariff for new solar qualifying facilities with nameplate capacities greater than 100 kilowatts."[23]

On June 16, 2016, the PSC issued a Notice of Commission Action ("Notice"), addressing its decision to grant NWE's Motion for Emergency Suspension and to suspend "the availability of NWE's Schedule QF-1 rates for solar QFs larger than 100 kilowatts unless the QF had submitted a signed PPA and executed an interconnection agreement on or before June 16, 2016."[24] NWE then informed PNW that "NWE could not execute a new Interconnection Agreement

---

[20] Doc. 75 at 3.

[21] Doc. 75 at 3; *See also* Doc. 75-7.

[22] *See* Docs. 75 at 3; 75-7 at 2-3, 8-9, and 12-13.

[23] Doc. 75 at 3.

[24] Doc. 75 at 4; *See also* Doc. 75-13.

for any solar QF project between 100 kW and 3 MW seeking a contract with the standard long term rate,"[25] including the Four Projects because PNW had not submitted a signed interconnection agreement on or before June 16, 2016.[26]

A PSC interim order dated June 16, 2016, succeeded the Notice ("interim Order No. 7500").[27] The temporary suspension did not apply if the QF had "submitted a signed (by the QF) PPA and had signed a final Small Generator Interconnection Agreement on or before June 16, 2016."[28]

A motion seeking relief from the interim Order No. 7500 suspension of the Schedule QF-1 tariff rates was filed by PNW on April 3, 2017.[29] PNW requested, in part, that the PSC confirm the PPAs relating to the Four Projects were not affected by Order No. 7500, notwithstanding the lack of interconnection agreements.[30] The PSC's Final Order ("Order No. 7500c") dated June 22, 2017,[31]

---

[25] Docs. 75 at 4; 75-12 at 3-4.

[26] *See* Docs. 75 at 5; 75-14 at 22 ("The Commission determines that it does not need to define fully executed contracts as it is clear that the four PNWS projects have failed to have executed interconnection agreements in place prior to the suspension pursuant to Order 7500.").

[27] *See* Docs. 75 at 4; 75-8.

[28] Doc. 75-8 at 18.

[29] *See* Docs. 75 at 5; 75-9.

[30] *See* Doc. 75-9 at 15.

[31] *See* Docs. 75 at 5; 75-10.

set new avoided cost rates, precluded further use of Schedule QF-1 tariff and denied PNW's motion for relief from Order No. 7500.[32]

On July 31, 2017, NWE and PNW submitted a Joint Motion for Reconsideration and Brief in Support on Behalf of Pacific Northwest Solar, LLC and Northwestern Energy ("Joint Motion")[33] requesting confirmation that the Order No. 7500c was not intended to affect prior executed PPAs.[34] The Joint Motion stated, in part:

> Under the Public Utility Regulatory Policies Act, a utility may be obligated to purchase the energy and capacity from a QF not only through a legally enforceable obligation but also through a consensual contract. *See* ARM 38.5.1903(2). Prior to the Commission's June 16, 2016 work session, NorthWestern had executed PPAs for the Four Projects and had so informed PNWS. Since these PPAs include elements of contract, the Commission should recognize the commitments of the parties and authorize PNWS and NorthWestern to move forward on those executed PPAs. *See* § 28-2-102, MCA; § 28-2-502, MCA.[35]

---

[32] *See* Docs. 75 at 5; 75-10 at 39.

[33] *See* Docs. 75 at 5; 75-5.

[34] *See* Doc. 75-5 at 5.

[35] Doc. 75-5 at 4-5.

The PSC's Order on Reconsideration ("Order No. 7500d"), dated October 5, 2017, addressed the Joint Motion.[36] There, the PSC determined that the Four Projects did not have executed interconnection agreements prior to June 16, 2016, and consequently did not meet the requirements for a legally enforceable obligation ("LEO").[37] It declined to decide if the four PPAs constituted contracts, noting that "[e]ven if the [PSC] ignored the interconnection requirement of Order 7500 and conducted an investigation to define the parameters of a fully executed contract between [NWE] and [PNW] involving the four projects, the [PSC] still lacks authority over executed contracts under Montana law."[38] "Any dispute

---

[36] See Docs. 75 at 5; 75-14.

[37] See Docs. 75 at 5-6; 75-14 at 22. Under PURPA, a QF may become bound to a utility either through a contract, or through a LEO:

> [A] QF has the option to commit itself to sell all or part of its electric output to an electric utility. While this may be done through a contract, if the electric utility refuses to sign a contract, the QF may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility to purchase from the QF, and a non-contractual, but still legally enforceable, obligation will be created pursuant to the state's implementation of PURPA. Accordingly, a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations.

Doc. 75-14 at 23 (quoting *JD Wind 1, LLC*, 129 F.E.R.C. ¶ 61,148, 61633 (F.E.R.C. November 19, 2009).

[38] Doc. 75-14 at 22.

between [NWE] and these projects should be viewed as a contract issue to be resolved in the appropriate court."[39]

## Discussion

NWE has now moved for partial summary judgment by reason of impossibility of performance.[40] The motion is opposed.

NWE seeks partial summary judgment on Count One (Anticipatory Breach of Contract) and Count Six (Declaratory Relief) of PNW's First Amended Complaint ("FAC").[41] It argues performance of the PPAs would violate the PSC's Orders, and that consequently it is entitled to partial summary judgment.[42]

FED. R. CIV. P. 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." "While the absence of any genuine dispute of material fact is a precondition for summary judgment, the crux of a summary judgment analysis is whether the movant has established entitlement

---

[39] Doc. 75-14 at 24.

[40] Doc. 60.

[41] Doc. 47.

[42] Doc. 61 at 2.

to judgment as a matter of law."[43] Montana law applies to PNW's claims.[44]

The parties agree on significant components of the underlying facts.[45] A central issue of disagreement "is the legal effect (or lack thereof) of the [PSC's] Orders" and the PSC's role and the effect of its orders on the Four Projects.[46]

NWE argues that the PSC's orders prevent NWE from performing under the old tariff rate, while "Counts One and Six of [PNW's] lawsuit effectively seek to enforce those contracts at the [now] prohibited rate."[47] PNW responds that the PSC's role in regard to the sale of power is confined "to reviewing and approving standard tariffs for projects (like the Schedule QF-1 tariff) and [by] determining when, in the absence of a fully-executed PPA, a project has achieved a LEO."[48] PNW argues that the four fully-executed PPAs constitute contracts, are beyond the

---

[43] 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.21 at 56-61 (3d ed. 2018).

[44] See Med. Lab. Mgmt. Consultants v. Am. Broad. Co., Inc., 306 F.3d 806, 812 (9th Cir. 2002) (When a federal district court sits in diversity, the court applies the forum state's substantive law.).

[45] See Doc. 72 at 2. PNW did not file a Statement of Disputed Facts as required under L.R. 56.1(b). "Failure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute." L.R. 56.1(d).

[46] Doc. 72 at 4.

[47] Doc. 61 at 6.

[48] Doc. 72 at 6.

PSC's jurisdiction and are to be enforced.[49]

In *JD Wind 1, LLC*, FERC noted that a commitment between a QF and an electric utility could result in either "contracts or in non-contractual, but binding, legally enforceable obligations [(LEOs)]."[50] In this case, the PSC asserts that the Four Projects, lacking executed interconnection agreements, do not qualify as enforceable LEOs subject to the PSC's jurisdiction.[51]

Order No. 7500d confirms that executed contracts are beyond the PSC's reach:

> Even if the [PSC] ignored the interconnection requirement of Order 7500 and conducted an investigation to define the parameters of a fully executed contract between NorthWestern and [PNW] involving the four projects, the [PSC] still lacks authority over executed contracts under Montana Law . . . . If relayed consent and a sufficient commitment result in a possible executed contract here, then the [PSC] does not have jurisdiction over contract disputes between QFs and electric utilities.[52]

In *Colstrip Energy Ltd. P'ship v. Mont. Power Co.*, the district court for the First Judicial District Court of Montana, Lewis and Clark County examined the

---

[49] *See* Doc. 81 at 4.

[50] 129 F.E.R.C. at 61,633.

[51] *See* Doc. 75-14 at 22.

[52] Doc. 75-14 at 22-23.

issue of whether the PSC had jurisdiction over a breach of contract dispute.[53] It concluded that Mont. Code Ann. § 69-3-603(1), gave "the PSC jurisdiction to determine rates and conditions of a contract for the sale of electricity where a qualifying facility and a utility cannot come to terms . . . [but] does not confer jurisdiction on the PSC to adjudicate disputes over executed contracts."[54] Authorization for the PSC "to review the rates as part of a rate proceeding,[ ]does not confer jurisdiction over executed agreements on the PSC."[55]

Here, NWE argues that the PSC's orders prevent performance of the Four Projects and therefore "it is legally impossible for NWE to meet its purported contractual obligations under the PPAs and, rather than being held to have breached the PPAs for the Four Projects, NWE is entitled to summary judgment on [PNW's] claims for anticipatory breach of contract and declaratory relief."[56]

Montana law provides "[w]here a contract has but a single object and such object is unlawful, whether in whole or in part, or wholly impossible of performance or so vaguely expressed as to be wholly unascertainable, the entire

---

[53] CDV-94-582 LEXIS 206 (D. Mont. Jan. 18, 1995).

[54] *Id.* at *3-4.

[55] *Id.* at *6.

[56] Doc. 61 at 12.

contract is void."[57] Summary judgment on impossibility of performance may be granted "where the subject matter of a contract is subsequently declared illegal, then it could be held that, as a matter of law, performance of the contract was impossible."[58] "'[I]mpossibility encompasses not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'"[59]

The subject matter of the four PPAs at issue has not been declared illegal. Nor has performance been shown to be impracticable because of some degree of difficulty. The PSC has not restrained NWE from performing the PPAs related to the Four Projects. Rather, it recognized in Order 7500d that "[a]ny dispute between [NWE] and these projects should be viewed as a contract issue to be resolved in the appropriate court."[60]

Summary judgment requires the movant to demonstrate that it has a legal

---

[57] MONT. CODE ANN. § 28-2-603 (2017).

[58] *360 Ranch Corp. v. R & D Holding*, 926 P.2d 260, 263 (Mont. 1996).

[59] *Cape-France Enters. v. In re Estate of Peed*, 29 P.3d 1011, 1014 (Mont. 2001) (quoting *Smith v. Zepp*, 567 P.2d 923, 927 (Mont. 1977)).

[60] Doc. 75-14 at 24. "Nothing in PURPA '[a]ffects the validity of any contract entered into between a [QF] and an electric utility for any purchase.'" Order 7447, *In the Matter of the Petition for Declaratory Ruling of Boulder Hydro Limited Partnership*, Docket No. D2015.7.60 at ¶ 12 (Dep't of Pub. Serv. Regulation, before the Pub. Serv. Comm'n of the State of Mont., Oct. 27, 2015)((quoting 18 C.F.R. § 292.301(b)(2) (2018)); *See also* Doc. 75-14 at 39-40.

entitlement to judgment as a matter of law.[61] Mere absence of a genuine issue of material fact is not enough.[62] Here, issues remain as to: (1) whether in the absence of a valid interconnection agreement, the PPAs constitute valid and enforceable contracts; and (2) whether NWE is excused from performance under the PPAs by reason of impossibility.

ORDERED:

Defendant's Motion for Partial Summary Judgment by Reason of Impossibility of Performance[63] is DENIED.

DATED this 21st day of August, 2018.

SAM E. HADDON
United States District Judge

---

[61] *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.21 at 56-61 (3d ed. 2018).

[62] *Id.* at 56-62.

[63] Doc. 60.